IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA
HARRISBURG DIVISION


UNITED STATES OF AMERICA          :
                                  :   CASE NO.
          v.                      :   1:00-CR-00173
                                  :
JAMES ANTHONY HUGHES              :


TRANSCRIPT OF PROCEEDINGS
HEARING ON DOWNWARD DEPARTURE MOTION
PURSUANT TO RULE 35


BEFORE:  HON. SYLVIA H. RAMBO

DATE  :  October 27, 2004
         9:15 a.m.

PLACE :  Courtroom No. 3, 8th Floor
         Federal Building
         Harrisburg, Pennsylvania

BY    :  Wendy C. Yinger
         U.S. Official Court Reporter

**FILED**
**HARRISBURG**

DEC 0 8 2004

MARY E. D'ANDREA, CLERK
Per_____
           DEPUTY CLERK

APPEARANCES:

ERIC PFISTERER, ESQUIRE
ASSISTANT U.S. ATTORNEY
    For the United States of America

THOMAS A. THORNTON, ESQUIRE          **ORIGINAL**
    For the Defendant

1          THE COURT:   This is the time and place for a

2    hearing on a downward departure pursuant to Rule 35 in

3    the case of U.S.A. v. James Anthony Hughes.   I think

4    that's the only thing we're here for today.

5          MR. PFISTERER:   That's correct, Your Honor.

6          THE COURT:   In your response to the 2255

7    motion, you indicated there was an oversight in not

8    filing a Rule 35 and that you were recommending a 20

9    percent additional departure, correct?

10         MR. PFISTERER:   That's correct, Your Honor.

11   The reason -- I don't know why no follow-up occurred.   I

12   recall Agent Morgan, sometime after the Defendant had

13   been sentenced, calling me asking for permission to talk

14   to the Defendant about some ongoing matters in York

15   County, and our office's position was that, that was

16   fine.

17         Then I don't believe I heard from him again

18   until I called him in response to seeing the defense

19   2255 and asking him if, in fact, did the Defendant

20   testify?   He indicated that he did.   I placed that

21   information in our motion.

22         Mr. Thornton pointed out to me this morning,

23   and just to make sure that the record is clear on this,

24   I detailed at page 6 of our response, Mr. Hughes'

25   cooperation with Assistant United States Attorney

3

1   Christy Fawcett in a previous case in which we decided

2   that, that cooperation didn't rise to the level that

3   would support a Rule 35.

4           I did not put in there, though I think I was

5   aware of it, that in that case, the Defendant did, in

6   fact, testify in the grand jury.  He did not testify at

7   trial.  And the rest of the information in there is

8   accurate.

9           THE COURT:  Is that the Gooding case?

10          MR. PFISTERER:  No, Your Honor, this is a --

11  prior to his cooperation in the murder case, he had been

12  questioned about a drug investigation that Attorney

13  Fawcett was involved in.  He did, in fact, testify in

14  the grand jury about one of the four Defendants that was

15  indicted in that case, but did not testify at trial.

16  And the rest of the information I gave about that case

17  and his cooperation is otherwise correct.

18          THE COURT:  Okay.

19          MR. PFISTERER:  That's all I have on the

20  motion, Your Honor.  I believe that, taken as a whole,

21  his prior record, the break that we recommended for him

22  in the 5K1 originally, that this, based on his

23  cooperation since then, is an appropriate

24  recommendation.

25          THE COURT:  Mr. Thornton.

1          MR. THORNTON:   Your Honor, we'd like to

2    present Mr. Hughes for testimony.

3          THE COURT:   All right.

4               Whereupon,

5                **JAMES ANTHONY HUGHES**

6      having been duly sworn, testified as follows:

7          COURTROOM DEPUTY:   Would you state your name

8    for the record, please?

9          THE WITNESS:   James Anthony Hughes.

10         COURTROOM DEPUTY:   Thank you.

11                **DIRECT EXAMINATION**

12   BY MR. THORNTON:

13     Q.   Mr. Hughes, are you currently incarcerated at the

14   medium correctional facility at Allenwood?

15     A.   Yes, sir.

16     Q.   Previous to that, you were at Schuylkill; is that

17   correct?

18     A.   Yes, sir.

19     Q.   Mr. Pfisterer just described the grand jury

20   testimony that you gave in the case involving the 212

21   gang.  Can you tell us exactly who you testified against

22   in that case?

23     A.   Mike Parker and Thaddeus Westry.

24     Q.   Westry, W-e-s-t-r-y?

25     A.   Yeah.

1     Q.   When you were brought down --

2             THE COURT:  May I have those names again?

3             MR. THORNTON:  Mike Parker.

4             THE COURT:  Harker, H-a-r-k --

5             MR. THORNTON:  No, P.

6             THE COURT:  Oh, Parker.  Is that correct?

7             MR. THORNTON:  Yes.  And Thaddeus Westry,

8   W-e-s-t --

9             THE COURT:  r-y?

10            MR. THORNTON:  Yes.

11            THE COURT:  Thank you.

12   BY MR. THORNTON:

13    Q.   Can you tell us where -- where did you come from

14   to testify in front of that grand jury?  Where were you

15   incarcerated?

16    A.   I was in Schuylkill, Schuylkill medium facility.

17    Q.   How long had you been there?

18    A.   I was there from March 12th to, I think, April

19   19th, 2002 -- not April, August.  August 19th, somewhere

20   around there.

21    Q.   While you were at the Federal Correctional

22   Institution at Schuylkill, were you participating in the

23   programming and doing all that sort of --

24    A.   Yeah, yeah.  I was doing quite a few programs.

25   Drug lifestyles, that has to do with like understanding

1    your criminal behavior, addressing it, and changing it;

2    the drug program, Dr. Walters, he ran that; also

3    creative writing classes, because I found out that I

4    have a, you know, ability to write.

5        Q.   Is that all at Schuylkill?

6        A.   Yeah.  It was a bunch of other programs, too, you

7    know.  I was really, you know, trying to just

8    rehabilitate myself through, you know, the programs they

9    offer.

10       Q.   Did you have any write-ups while you were at

11   Schuylkill?

12       A.   Oh, no, never.

13       Q.   And what occurred that made you leave Schuylkill?

14       A.   Well, I looked on the call-out, and I seen that I

15   was out on writ.  They posted it up, you know, for writ.

16   And I pretty much knew it was probably -- I was -- that

17   the Parker brothers, you know, the other guys, they were

18   going to trial, so they called me --

19            THE COURT:  They were going to what?

20            THE WITNESS:  They were going to trial.  And

21   they called me to go, I guess, testify at trial.  But

22   whoever the judge was that, like, went over the trial

23   said that there was so many witnesses or whatever that,

24   you know, when I got down to Dauphin County, they was

25   telling us that, there was so many witnesses.  And

1  after, you know, I guess, the dude's brother, you know,

2  testified, it was like really no need for them to call

3  the people they called down to testify at trial.  But,

4  you know, I never testified at the trial with the grand

5  jury.

6      Q.  What occurred when you --

7      A.  Oh, well, when I seen that I was going out on

8  writ, you know, other inmates, they get to look over it,

9  right.  So a dude came up to me, and I was standing on

10  the rail afterwards looking at the TV, and he like

11  cornered me into the rail, and was like, hum, where are

12  you going?  Are you going out on writ?  You know, you

13  ain't got no legal work.  I don't be seeing you with

14  legal work and stuff like that coming in here.

15      And I'm sitting there staring at him, and he's

16  like pushing up on me.  Then a bunch of other dudes to

17  the side, and he was like, yo, I tell you what, when you

18  leave and you come back, right, expect that knife to be

19  administered like this, right.  So I was pretty much

20  like caught between these dudes, so I like backed up,

21  and I was like, you know, giving him like, you know, yo,

22  what, what you goin on.

23      But I made it to the captain's office, and they

24  put me in protective custody, you know, pretty much,

25  so --

1    Q.  That was prior to you coming to Dauphin County?

2    A.  Yeah.

3    Q.  When you went back, did you go back to

4 Schuylkill?

5    A.  Yeah, they put me -- when I went back, I went to

6 PC.  Then they transferred me to another prison.

7    Q.  Was that Allenwood?

8    A.  Yeah, yeah.

9    Q.  And what consequences did you suffer as a result

10 of having to leave Schuylkill and going to Allenwood?

11    A.  Well, it pretty much knocked me out of my program

12 as far as things I was doing.  Then another thing, it

13 made me real reluctant, you know what I'm sayin, to get

14 close to anybody because I knew everybody was subject to

15 scrutinize me, you know what I'm sayin, what I was into

16 or what I was, you know, representing.

17    So, you know, it pretty much caused me to be real

18 reclusive because I was scared, you know.  Like right

19 now, I got -- when I leave here, I got some explainin to

20 do when I go back to the other jail, you know, because,

21 you know, I told them, you know, I'm goin back to court,

22 you know, because I got stuff in to do, you know.

23    But it's like really hard because dudes come at

24 you, and the first thing they want to see is your

25 paperwork.  That's why, I guess, they got rid of the

1  PSI. But, you know, it's like an unwritten rule, when

2  you come back, you better have your stuff ready or be

3  prepared to go, you know, in the corner pocket, you know

4  what I'm sayin.

5      So that's another stress factor to really, you

6  know, worry about. And, you know, it's just crazy, you

7  know. People, they won't let you just do your time, you

8  know.

9  Q. Now during your incarceration, have you also been

10  able to pay off your fine?

11  A. Oh, yes. Really, that's why I said, when I got

12  to Allenwood, I just worked. They have like an overtime

13  up there where you can do in excess -- I was doing 400

14  hours a month, you know what I mean, like a hundred

15  hours a week, just working, you know. I got that

16  obligation out of the way. And then like right now, I'm

17  involved in mentoring and positive thinking.

18      I just finished art, an art program. Right now,

19  I'm involved in typing I class. I'm learning how to

20  type. It's just so much I'm doing. I learned -- I

21  taught myself a second language. All kinds of stuff,

22  you know.

23  Q. There is also another situation where you did

24  come and testify in York County. Can you tell the Court

25  what happened with that?

1    A.   That was for Willy Gooding.  He like committed a

2    murder some years ago, him and a bunch of other fellas.

3    And I had no like direct contact, like as far as like

4    being in their little gang, like participating with the

5    murder or anything, but I was involved somehow because,

6    just by happenstance, I just happened to be there when

7    it goes down.  And when the dude got murdered, it was

8    like a friend of a friend, and, you know, I went to, you

9    know, the people and told them I knew.

10       So I worked on their behalf by literally finding

11   out the information, turning on.  So he went on the run.

12   He was like on America's Most Wanted and all kinds of

13   stuff.  So when they finally found him in like 2000, you

14   know, they got ahold of him, and then they called me

15   down.

16   Q.   What exactly did you testify to?

17   A.   What he told me, you know.  Like him and the

18   dude, Nino, they basically, when the situation went

19   down, I happened to just walk in their house.  And dude

20   was like, yo, I'm gonna show you how somebody get

21   killed.  I was like, oh, what's going on?  Then he

22   explained that some people just tried to rob him, right.

23   I'm like, I'm just here to pick up my Nintendo, you know

24   what I mean.  I'm leaving.

25       Then he asked me for a gun, you know, to do some

1  dirt with.  I'm like, you know.  Then like, dude got

2  found the next day.  The next prior day, the guy got

3  shot in his face and all that.  And it was like a couple

4  blocks from where I was stayin at.  They took him up in

5  this place.  But I seen the dude Willy like three days

6  later.

7       And I got in the car and just, you know, test,

8  you know.  I'm like, yo, the dude Gerber, man, you know

9  somebody killed him?  He was like, yeah, you know,

10  that's how we do, you know, people get in the way,

11  blase-blah, you know.

12     Q.  Did you testify to that at trial?

13     A.  Yeah.

14     Q.  And was he convicted?

15     A.  He was convicted.  Yeah, he was convicted.

16     Q.  And those are the two, I guess, instances of

17  information that you have given since your

18  incarceration, is that right, or is there more?

19     A.  Well, when I was in the hole up at Schuylkill, I

20  was trying to contact Mr. Pfisterer and let him know,

21  you know.  I was writing letters letting him know what

22  I've done, and I was in the hole, and the circumstances

23  why I was in the hole.  And basically, I was, you know--

24     Q.  Were there other things that you were trying to

25  tell Mr. Pfisterer about?

1      A.   Yeah.  Excuse me for a second.

2      Q.   Are you all right?

3      A.   Yeah.  Excuse me.  Sorry.

4      Q.   Is this an emotional situation for you, Mr.

5  Hughes?

6      A.   Yeah, just everything, you know, because I know,

7  you know, I'm perceived as what I am perceived as.  But,

8  you know, I'm making a hell of a, you know, try to turn

9  my whole life around, my whole train of thought, and

10  better myself.  And I just can't believe, you know,

11  that -- when I got in trouble, I told them, you know,

12  I'm tired of it all, you know.

13        I just want to end this here.  And I'm pretty

14  much glad I got caught because I was stressed out in my

15  mind just dealin with this stuff.  I just -- I know the

16  word fair is kind of, you know, a hard word, but I gave

17  my half of the bargain where, not only was I sorry for

18  the wrong I did, I was just trying to make amends by

19  burning all the bridges that Mr. Pfisterer asked me to

20  burn, and what he would give me if I pled guilty, this

21  is what I would do.

22        And I did that.  And all I'm askin is just for

23  another chance to be with my daughters and just really

24  plant seeds in them to show them that this right here is

25  just not the road, you know.  And I really believe that

1  just -- I just need a chance.  And I understand, you

2  know, that Mr. Pfisterer gots a job to do, but I was

3  under the assumption that everybody was gonna play by

4  the book, you know.  Just, hey, you do this.

5      My attorney, he drilled it in my head.  He was

6  like, yo, you do this, and you ain't got nothin to worry

7  about.  He was like, you ain't got no problems to think

8  about somebody that's going to screw you because he

9  wouldn't do that because that's just not how it's done.

10     Q.  Hang on for one second.  In the courtroom are

11  some individuals.  Are they family members?

12     A.  My two daughters, my -- if you want to say, my

13  wife, my common-law wife.  It's been hard on them, you

14  know.  My five-year-old, she basically, you know, she

15  ain't get a chance, you know, to really be around me.

16  And it's hard on my wife.

17     I was the only support they had.  They're

18  basically caught in what I did.  And it just kills me to

19  know that I put them through it, you know.  And just --

20  I just want -- I don't expect ya all to let me go.  I

21  don't expect that.  But just give me a chance to -- I

22  want to be there.  Excuse me for crying.

23     I want to be there when my daughter goes through

24  a guy trying to take advantage of her, you know what I

25  mean.  I want to be there, you know.  And she gets honor

1  roll every marking period.  I want to be there when she

2  walks across that stage, you know what I mean.  Excuse

3  me.  I'm sorry for crying.  I just --

4     Q.  That's all right.  Mr. Hughes, what you said a

5  moment ago was that originally that your attorney was

6  Frank Arcuri; is that right?

7     A.  Yeah.

8     Q.  And correct me if I'm wrong here.  I'm sort of

9  trying to paraphrase what you said.  But Mr. Arcuri,

10  when he originally worked the plea agreement with you

11  and got you to sign the plea agreement, promised you a

12  certain amount of reduction?

13     A.  Yes, he did.  Yes, he did.  When I first -- Mr.

14  Pfisterer, when we sat across the table, my attorney was

15  sitting here, and Mr. Pfisterer said, listen.  All

16  right.  Here's the deal.  Standard procedure.  My

17  attorney basically was telling me, yo, 50 percent -- and

18  I would not lie, just because I know, lies compound upon

19  lies, where they get you.  They get you nowhere.

20              THE COURT:  I think I addressed this issue

21  in a memo, promises made by counsel.

22              THE WITNESS:  I'm sorry.  I'm sorry.

23              MR. THORNTON:  I wasn't sure if that was

24  addressed or not.  I'll move on.

25              THE WITNESS:  But right now, I'm really

1  upset that I'm crying and everything.  So please excuse

2  me.  I just want to say, you know, before the Court

3  that, you know, I'm cured of the disease, you know, that

4  basically had me thinking that, you know, that was the

5  only thing I had to do, you know.

6         I know I'm above that now, you know.  I know

7  that the ramifications, what it does to families.  I

8  regret, as far as the people that I hurt.  I even

9  understand, like the addicts I used to, you know, give

10  stuff to, that they had kids, you know.  I know, like

11  going to jail, people usually make newfound Christians,

12  you know.  I don't pray to, you know, go home.  I don't

13  pray for all that.  I pray for peace of mind, and I pray

14  for forgiveness that, you know, that the people -- I

15  write people to ask them for forgiveness.  I'm sorry.

16         You know what?  What I did, you know, wasn't

17  right.  And, you know, and I'm paying for it, but, you

18  know, one day maybe we might be able to hookup and, you

19  know, really just understand.  We made some mistakes,

20  you know.  And the time that, you know, I've been

21  incarcerated, I learned the value of freedom.  I learned

22  the work ethic.

23         I mean, I couldn't imagine me not working on

24  the street now.  This going out there and wasting, you

25  know, myself away for something that doesn't even amount

1    to nothing, you know.  That's beneath me.  I feel right

2    now, you know.  I'd really just like to stress to the

3    Court, you know, that I'm not crying wolf, you know.

4    I've been in trouble before.  I know, you know.

5           And if it was just for me, you know, I

6    shouldn't be tooken into consideration because I did

7    wrong, but I just need to give people that love me a

8    second chance through me, you know.  It's like, I can be

9    more conducive to my kids if I'm just there, you know.

10   I write them and I try to -- my daughter, I try to give

11   her advice.

12          She's in the 6th grade now, you know.  And I

13   try to, you know, tell my wife, you know, little things

14   that she can do to help raise the kids by herself, you

15   know.  And it kills her.  It just kills her.  And, you

16   know -- you know, Your Honor, the Court, I just

17   really -- I mean, I'm being good.  And I know some

18   people just be good for the time that they're

19   incarcerated.  Just be a good judge.  I mean, it's

20   there.  The rehabilitation is there.  I am trying so

21   hard to just --

22   BY MR. THORNTON:

23     Q.  Mr. Hughes, your request of the Court is that the

24   Court depart down to a sentence of 131 months?

25     A.  Yeah.  That would be, you know, basically a gift,

1  you know, because I know there's a lot of times that,

2  you know, the Court is put in a position, you know, to

3  look at an individual and say, hey, you know, nah,

4  buddy.

5      I'm not saying that I deserve that, but I'm

6  saying that, that fair is fair, and just another chance.

7  Nobody will be sorry.  Nobody will be sorry.  From the

8  day they arrest me, from the time Mr. Bonovick

9  (phonetic) said, you know what, federal officer.  I

10  said, you know what?  I'm just tired, and I'm thanking

11  you because I'm just tired of all this.  And he said,

12  you know what?  That's the best thing you can do for

13  yourself.

14      And from immediately, the people knew that I

15  wasn't gonna put them through too much problem.  I just

16  want to get it all over with, you know.  Some way, some

17  how, just, you know, just go to, you know, live life, go

18  work at McDonald's, go work in a factory, go do

19  something, but at least be, you know, normal and live.

20  Live.  This ain't no life, you know.

21          MR. THORNTON:  Thank you very much, Mr.

22  Hughes.

23          THE COURT:  Cross-examine.

24          MR. PFISTERER:  I have no questions.

25          THE COURT:  You may step down.

1          THE WITNESS:  I'm sorry for cryin, ya all.

2          MR. THORNTON:  Your Honor, we have no

3    further testimony to present.  We're arguing along the

4    lines of what Mr. Hughes has suggested.  As a result of

5    his cooperation, and not only the Gooding murder case,

6    which seems to have resulted in a verdict of guilty for

7    an individual who killed another person, but he has

8    cooperated in other areas.

9          And also, he's explained the true depth of

10   his conversion really from a life of crime to a person

11   that wants to be upstanding and help with his family and

12   his daughters, who obviously cares for him very much.

13   They've come here today to express that care.

14         Consequently, we'd ask Your Honor to

15   consider a departure down to the range that Mr. Hughes

16   has suggested of 131 months.

17         THE COURT:  Mr. Pfisterer.

18         MR. PFISTERER:  Your Honor, for the record,

19   I just want to say that the Government does not -- I

20   have not, and I have never made a specific promise to

21   anyone in a criminal case nor, to my knowledge, did Mr.

22   Arcuri, and he certainly did not do it in front of me.

23         Having said that, however, Mr. Hughes has

24   done everything that has been asked of him since the day

25   he was arrested.  I have no quarrel with the idea that

1    he has done what I asked him to do, which was to burn

2    all of the bridges he had to criminal conduct and

3    activity so that I would not have to see him again, as I

4    have with a number of people that I've prosecuted.

5              So in that regard, I believe he has, and by

6    his actions, does deserve a Rule 35 reduction that we've

7    made to the Court.

8              THE COURT:  What's your response to his

9    request?

10             MR. PFISTERER:  Your Honor, it's very

11   difficult to put a month figure on the harassment and

12   the unavoidable conflict that comes in prison with those

13   that cooperate and those that at least can deny it,

14   because, frankly, my experience has been that almost all

15   of them do cooperate.

16             However, those that there's no proof against

17   do tend to persecute those that they can, that they do

18   find information out about their cooperation.  I will

19   say that our -- the United States official position is

20   in our motion.  Obviously, the Court has the discretion

21   to depart as far as it feels is necessary.

22             THE COURT:  How do you come up with the 131?

23             MR. THORNTON:  I think the 131, Your Honor,

24   is what Mr. Hughes detailed in his 2255 motion, which

25   would have been basically the promise for, by Mr.

1 | Arcuri.  It comes to about 50 percent.

2 |    THE COURT:  Do you remember what the

3 | reduction was in the initial downward?  I know what his

4 | sentence ended up being.  I don't know what the

5 | percentage of reduction was.  Do you have that, Mr.

6 | Vought?

7 |    PROBATION OFFICER:  I don't know what the

8 | percentage is.  I have the number of months.

9 |    THE COURT:  It was 192.

10 |    PROBATION OFFICER:  292 was the minimum.

11 |    THE COURT:  And he got?

12 |    PROBATION OFFICER:  240.

13 |    THE COURT:  Oh, okay.  Can I see Mr. Vought?

14 |    (Whereupon, a discussion was held at sidebar

15 |     off the record.)

16 |    THE COURT:  We'll enter this order:

17 |    The motion under Rule 35 is granted.  The

18 | judgment of conviction dated 1/19/01 is amended to

19 | reflect the imposition of a sentence of 180 months,

20 | which represents a 25 percent downward departure.  In

21 | all other respects, the judgment of 1/19/01 is affirmed.

22 |    COURTROOM DEPUTY:  Court's in recess.

23 |    (Whereupon, the proceeding concluded at

24 |     9:44 a.m.)

25 |

1

2

3                               CERTIFICATION

4

5

6              I hereby certify that the proceedings and

7     evidence are contained fully and accurately in the notes

8     taken by me on the within proceedings, and that this

9     copy is a correct transcript of the same.

10

11

12

13                              Wendy C. Yinger
                                U.S. Official Court Reporter
14                              (717) 440-1535

15

16

17

18

19

20              The foregoing certification of this

21     transcript does not apply to any reproduction by any

22     means unless under the direct control and/or supervision

23     of the certifying reporter.

24

25